# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

LAURA JACOBSON,

    Plaintiff,

  v.             Case No. 16-C-53

NANCY BERRYHILL,

    Defendant.

---

## DECISION AND ORDER

---

The Plaintiff filed this action seeking judicial review of the decision of the Commissioner of Social Security denying her disability benefits. She claims that the ALJ erred in assessing the medical evidence, her credibility, her residual functional capacity (RFC) and her ability to return to past work. Finding no error and substantial evidence to support the decision, I affirm.

### I. Background

This appeal is a review of the second iteration of the Plaintiff's claim for disability benefits. After a hearing in 2012, Administrative Law Judge Everstine denied disability benefits; the Plaintiff appealed. In September 2013, the Appeals Council remanded the case on the grounds that the ALJ had not adequately translated the Plaintiff's "moderate" mental limitations regarding concentration, pace, and persistence (CPP) into a residual functional capacity ("RFC"). (R. 125-126.) The case was assigned to ALJ Robert Bartelt, who conducted a second hearing in 2014. After this second hearing, however, and based upon the testimony of a medical expert at the second hearing, ALJ Bartelt found that the Plaintiff's limitations in CPP were only mild. Upon his consideration of all of the evidence, he concluded that the Plaintiff was not disabled. It is that decision the Plaintiff asks

the court to review.

The Plaintiff, aged 51 at the time of the 2014 hearing, suffers from a number of physical and mental issues, including pain from fibromyalgia, headaches, carpal tunnel, depression and anxiety, among others. She had last worked at a childcare facility but testified that she had to leave the job because various smells were making her headaches worse. (R. 67.) She stated that her worst condition was the daily migraines, and in addition to that she had two bulging disks in her cervical spine. In addition, her depression and anxiety had been conditions since her early twenties, and she had also suffered from carpal tunnel syndrome, for which she had surgery in 1991. (R. 69-70.)

She stated that her migraines became unbearable in late 2009 after a change in her work situation and her belief that a supervisor was picking on her, which made things more stressful. (R. 71.) Although she continued to work for a few more months, she took family leave in March 2010 and ultimately was let go a few months later. She testified that the migraines were normally a "five" out of ten, but sometimes escalated to six or seven, at which point she would need to lie down in a dark room for a few hours and use a cool compress. (R. 73.) This occurred four or five days per week. At the hearing she appeared wearing a hat and dark glasses because the sunlight and fluorescent lights bothered her and made her eyes hurt. She also appeared for several physician visits wearing sunglasses.

The Plaintiff also testified that she had pain due to fibromyalgia, having "18 points on me that all hurt . . . but mostly my elbow, my right elbow, hurts a lot . . . the more activity I do, the worse it hurts." (R. 75.) For daily activities, she described a somewhat normal routine involving light cleaning, some laundry, and shopping, but she expressed a reluctance to drive a car due to side-effects of her medications, and she noted pain and an inability to lift a gallon of milk. (R. 76-78.) She

2

attended church regularly, but had to "nap for the whole, entire afternoon" afterwards. (R. 78.) Her medications caused dry mouth, tiredness, dizziness and some clumsiness. (R. 80.) She stated that she could sit for a half hour and walk five or ten minutes. (R. 82.)

ALJ Bartelt also called a medical expert at the hearing. Dr. Allen Hauer, Ph.D., a psychologist, reviewed the medical record and heard the testimony. (R. 89.) He first opined that although the Plaintiff had received a number of different mental health diagnoses over the years, including PTSD, major depression, anxiety disorder, and somatization disorder, he believed that the listing 12.04 was most appropriate. That listing included mood disorders, including dysthymic disorder, which he found the most apt description of her condition. He described it as a "low grade mood disorder, a depressive disorder" characterized by depressed moods, worry, tension, and feelings of pessimism. (R. 90.) Dr. Hauer was then asked about any limitations the Plaintiff would experience from her conditions, and he concluded that her mood disorder would impose no limitations on activities of daily living and only mild limitations in social functioning. She would also have only mild limitations in concentration, persistence and pace. (R. 91.) "I think there would be a mild restriction or loss in terms of her overall persistence and efficiency due to when her moods are low." (R. 92.)

A vocational expert also testified. He concluded that an individual of the claimant's age, experience, education and limitations (as hypothesized by the ALJ) would be able to perform the job of nursery school attendant. Such positions would allow the individual to wear sunglasses for light protection. (R. 98.) There would not, however, be any jobs available for someone who would be off-task one to five hours several days a week due to migraine headaches. (R. 99.)

The medical record was less bleak than the Plaintiff's own testimony. For example, in a visit

3

with Nurse Practitioner Marx on February 21, 2012, she denied any muscle or joint pain at all. (R. 1545.) In fact, most of her interactions with NP Marx and Dr. Carlson, her primary care physician, were limited to reviews of her cholesterol and fail to mention any fibromyalgia pain or other issues. (R. 1535: "She denies any muscle aches or fatigue.") In another visit with Dr. Carlson, she reported having headaches "all the time" but then rejected his suggestion that she see get a second opinion to treat them. (R. 1533-34.) "Basically, her review of systems is floridly positive from head to toe. It is really hard to pin her down on any specific problems." (R. 1533.) Eventually, when she asked him for a disability letter, he refused to provide one since he viewed her as not disabled. (R. 1606.)

In his written opinion ALJ Robert Bartelt was mindful that the case had been remanded by the Appeals Council on the question of mental limitations, in particular the issue of translating the Plaintiff's moderate limitations in concentration, persistence or pace into a residual functional capacity. However, based on the testimony of the medical expert the ALJ enlisted, as well as his own independent review of the record, ALJ Bartelt concluded that the Plaintiff did not actually *have* any such moderate limitations. The ALJ concluded: "Pursuant to the testimony by the medical expert at the supplemental hearing, there is no 'severe' mental impairment. Allen Hauer, Ph.D., testified that despite all the various diagnoses in the record, the only condition that he felt was present was a dysthymic disorder, characterizing it as a low grade mood disorder marked by a dysphoric mood, worry, motor tension and general feelings of discomfort and pessimism." (R. 29-30.) The ALJ added:

> Having reviewed the medical evidence and testimony, the undersigned finds himself
> to be in total agreement with Allen Hauer, PhD. While that may seem on its face to
> be a bit radical given the prior psychiatric treatment notes, the diagnoses by Robert
> Schedgick, Ph.D., and the residual functional capacity forms completed by the
> Wisconsin Disability Determination Services which conclude that claimant has a

4

'severe' impairment, when really looking at the actual records there does not seem to be a whole lot of abnormalities on mental status examination, only a lot of complaints. . . . The undersigned defers to Allen Hauer, Ph.D., medical expert at the hearing, who unlike the Disability Determination Services has had the opportunity to observe claimant as well as to examine subsequent records since then.

(R. 30.)

The ALJ further observed:

This case essentially comes down to the issues of pain and credibility and simply stated claimant is not all that credible. When factoring in both her physical complaints and her mental complaints and contrasting them with the actual medical records, it becomes quite clear that a certain amount of exaggeration exists not only in terms of the pain complaints, but also regarding claimant's claims of limitations in her activities. While her constant complaining at work may have worn thin on coworkers and prompted concerns by the parents of the children she was involved with, the question is does she have the physical and mental capacity to engage in competitive employment. Claimant had demonstrated such a capacity in the past and looking at the medical evidence in the file, the undersigned sees nothing since 2010 that would change that opinion.

(R. 30-31.)

On that basis, the ALJ found that the Plaintiff could perform a range of light work, including her past work as a day care provider.

## II. Analysis

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue,* 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007). It is the Commissioner, not the reviewing judge or judges, who is charged with making the decision whether a claimant is disabled.

5

**A. Existence of a "Severe" Impairment**

As noted above, instead of answering the question for which the Appeals Council remanded the case, the ALJ essentially rejected the premise of the question, which was that the Plaintiff had a severe mental impairment at all. Although in some circumstances such an approach would be questionable, I conclude that in this case the new evidence presented to the ALJ entitled him to make such a determination.

Recent precedent from the Seventh Circuit provides a helpful counterpoint and, because of some superficial similarities between the two cases, I will begin with a discussion of *O'Connor–Spinner v. Colvin,* 832 F.3d 690, 696 (7th Cir. 2016). Because that case was issued while this appeal was being briefed, the parties have not cited it. There, the Seventh Circuit reversed (for the second time) an ALJ's decision because it did not adequately take into account the claimant's moderate limitations in concentration, persistence or pace (sometimes referred to in the jargon of cases like this as "CPP"). As here, the ALJ had concluded that the claimant did not suffer a severe impairment, despite being diagnosed with major depression and despite state agency reviewers finding moderate limitations. Instead, as here, the ALJ relied on the opinion of a non-treating source who reviewed the record and concluded that the claimant did not have a severe impairment. In a sharply worded opinion, the Seventh Circuit noted that

> the ALJ decided that "major depression, recurrent severe" isn't a severe impairment based on the opinions of two state-agency psychologists who did not even examine, let alone treat, O'Connor–Spinner. That determination is not supported by substantial evidence and, indeed, strikes us as nonsensical given that the diagnosis, by definition, reflects a practitioner's assessment that the patient suffers from "clinically significant distress or impairment in social, occupational, or other important areas of functioning." . . . We have not found a published opinion from any circuit in which an ALJ declared that major depression was not a severe impairment . . .

6

*Id.* at 697 (citations omitted).

Here, at first blush, it appears that essentially the same thing occurred. Several medical providers, including treating providers, had concluded that the Plaintiff suffered from depression and other mental health issues. Then, a non-treating source (Dr. Hauer) reviewed the record and concluded that although she might suffer from what he called dysthymic disorder, her condition was mild and she was only minimally limited in her persistence, concentration or pace. As in *O'Connor-Spinner,* the ALJ relied on this non-treating expert to conclude that the Plaintiff's mental impairments did not reach the severe level.

In contrast with *O'Connor-Spinner*, however, where the Commissioner's decision was reversed and remanded, 627 F.3d at 621, in this case the Appeals Council vacated ALJ Everstine's decision, which means ALJ Bartelt was starting from scratch. Also in this case the medical record was wholly unsupportive of the existence of a severe mental impairment. In fact, unlike *O'Connor-Spinner*, none of the examining physicians or psychologists believed the Plaintiff suffered from major depression of a severe or even moderate nature. In 2010 state agency consulting psychologist Robert Schedgick, Ph.D. evaluated the Plaintiff. He concluded that she had an adjustment reaction with depressed mood, as well as somatization disorder resulting from her multiple reports of illnesses. (R. 696.) He concluded that her prognosis was "good" and that there was hope that her medications would help with her depression. (*Id.*) In addition, she could understand and remember information adequately and could interact reasonably well with supervisors, coworkers and the public. (*Id.*) Dr. Schedgick also concluded, without further explanation, that "her work pace may need to be modified." (R. 696.) Under Axis V, he concluded that "She has a GAF around 70. Over the last year, she has probably had a GAF between 85 and 95." (*Id.*)

7

Esther Lefevre, Ph.D., a state agency reviewer, completed the Psychiatric Review Technique, a form that explains any diagnoses and limitations a claimant might have. (R. 717-733.) Dr. Lefevre concluded that the claimant had an adjustment disorder with depressed mood and somatization disorder, the latter as a result of her frequent reports of illnesses. (R. 723.) She concluded that the Plaintiff would experience moderate difficulties in maintaining concentration, persistence or pace, as well as moderate limitations in understanding instructions and maintaining attention, among other things. (R. 731.) In a narrative statement, Dr. Lefevre repeated that the claimant would be "moderately impaired in her ability to concentrate and carry through with work tasks in a timely fashion. Regardless, she is capable of understanding, remembering and carrying-out the basic demands of unskilled work . . ." (R. 733.)

State agency reviewer Deborah Pape, Ph.D., also reviewed the record and found evidence of affective disorders, anxiety-related disorders and somatoform disorders. (R. 699.) Like Dr. Lefevre, she found moderate difficulties in maintaining concentration, persistence or pace. (R. 709.) Reviewing the results of Plaintiff's consulting exam with Dr. Schedgick, Dr. Pape noted that Plaintiff might be overstating her "migraine" headaches. During the interview with Dr. Schedgick, for example, despite wearing sunglasses and claiming that she was suffering a migraine, she claimed to be in no pain. (R. 715.) Dr. Pape concluded that "Claimant's preoccupation with physical ailments has limited her ability to function in her daily life and has resulted in the loss of her most recent job that involved working with children. Claimant is capable of unskilled work at this time, but would most likely be able to function at a higher level with limited interaction with others." (*Id.*)

In 2012, Dr. Oelschlager, a psychiatrist who occasionally treated the Plaintiff, diagnosed her with "recurrent major depression, mild." (R. 1706.) He noted a sad mood and constricted affect,

but also observed that she denied any suicidal thoughts, and that memory and concentration were grossly intact. (R. 1705-06.) After Dr. Oelschlager retired, the Plaintiff saw Dr. Miranda, another psychiatrist. At a 2013 visit, she described her mood as "stable, okay" and denied feeling depressed. (R. 1650.) Dr. Miranda noted the Plaintiff's history of depression but noted that she was "currently doing well and stable, so will continue her on the same dose of Effexor." (R. 1653.) Dr. Miranda diagnosed the Plaintiff with "major depressive disorder, recurrent, in remission" and assessed a GAF score of 60. (*Id.;* R. 1598.) These were among the most recent records to come before ALJ Bartelt and the medical expert Dr. Hauer.

In sum, the medical providers and reviewers concluded, at various times, that Plaintiff suffered from depression and/or dysthymia of, at worst, a mild nature, and her own psychiatrist described the depression as being "in remission." (*Id.*) Dr. Hauer, reviewing the entire record for the hearing, concluded that the Plaintiff's mental limitations, if any, would be minimal.

This medical record stands in stark relief to *O'Connor-Spinner*, where the claimant had been diagnosed with major depression of a "severe" nature, had much lower GAF scores, and was suicidal. The court noted that such a diagnosis necessarily rises to the level of a severe impairment because severe depression, by definition, causes "clinically significant distress or impairment in social, occupational, or other important areas of functioning." 832 F.3d at 693 (citation omitted). Moreover, "O'Connor–Spinner's GAF score once again was recorded as 50, indicating serious symptoms or functional impairments. The diagnosis of major depression is repeated in records from 2007 and 2008. So are O'Connor–Spinner's self-reports of suicidal thoughts. One therapist documented an incident in which O'Connor–Spinner, in a fit of anger, had discarded all of her medications—prompting her husband to remove his guns from their home 'for safety.'" *Id.* Thus,

9

in *O'Connor-Spinner* the ALJ ignored a lengthy and documented history of severe depression with suicidal thoughts and self-destructive behavior and instead relied on the opinion of a non-examining physician (an opinion the court also criticized). Here, by contrast, examining physicians like Dr. Oelschlager found only mild depression, while the later visits with Dr. Miranda in 2013 and 2014 revealed she was doing "well" and her depression was "in remission." (R. 1645, 1653.) The state agency reviewers who found "moderate" limitations in concentration, persistence or pace reviewed the record back in 2010, before these more benign diagnoses. Notably, even in 2010 the consulting examiner, Dr. Schedgick, concluded merely that Plaintiff's "work pace *may* need to be modified," (italics added) but such a vague conclusion is hardly enough to conclude that the Plaintiff was actually laboring under a mental illness that would materially affect her CPP. (R. 696.) And, in finding a GAF score of 70, Dr. Schedgick was concluding that the Plaintiff's limitations, if any, were hardly disabling.[1] Indeed, as the ALJ noted, her GAF scores were suggestive of someone who was "quite functional," especially when considering scores as high as 95. (R. 25.) *Barnica v. Colvin,* No. 13-C-1012, 2014 WL 4443279, at *4 (E.D. Wis. Sept. 9, 2014) (discussing GAF scores and noting that "although GAF scores are certainly not dispositive, they are sometimes used by courts as short-hand assessments of a claimant's limitations.") Moreover, again in contrast to *O'Connor-Spinner*, there were no suicidal thoughts and no record of a diagnosis of severe depression. No therapist expressed concern due to the fact that the Plaintiff's husband, a hunter, kept one or more guns around the house. (R. 1652.) Finally, in the last visits leading up to the hearing, the Plaintiff

---

[1]A GAF score of 60 reflects moderate symptoms or "moderate difficulty in social, occupational, or school functioning." A GAF score of 61–70 reflects mild symptoms or "some difficulty" in those areas, but the individual "generally function[s] pretty well." *Sims v. Barnhart,* 309 F.3d 424, 427 n.5 (7th Cir. 2002) (citing American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 30 (4th ed. 1994)).

was consistently doing "well" and her depression was deemed to be "in remission." (R. 1645-53.) *Denton v. Astrue,* 596 F.3d 419, 425 (7th Cir. 2010) (ALJ entitled to rely on medical opinion that depression was in remission).

In sum, given the record, and particularly the newer records that made their way into the file from 2012 to 2014, it was reasonable for the ALJ to rely on the opinion of Dr. Hauer, who had the opportunity to review the *entire* file, and who found no substantial restrictions resulting from mental health issues—whether they were deemed to be dysthymia, depression, somatoform disorder, or anything else. Accordingly, it was not error for the ALJ to weigh the entirety of the evidence when considering whether to impose any CPP limitations in the RFC.[2]

**B. Other Medical Evidence**

The record is notable for its absence of any treating source who opined that the Plaintiff was disabled. This is perhaps especially unusual given that the medical record extends to nearly 1,800 pages. In any event, the Plaintiff argues that the ALJ erred by not properly considering the medical

---

[2]Dr. Hauer found "mild" restrictions in CPP, and the ALJ stated that he agreed with Dr. Hauer's opinion in its entirety. It could be argued that the ALJ was therefore obligated to include those "mild" restrictions in an RFC. "A failure to fully consider the impact of non-severe impairments requires reversal." *Denton v. Astrue,* 596 F.3d 419, 423 (7th Cir. 2010). Plaintiff does not make the argument, however, and so it is waived. In any event, even if the Plaintiff had made that argument, it is clear from the opinion that the ALJ's finding that depression was non-severe meant that he did not find *any* limitations, even "mild" ones. "[T]his is not a case where an ALJ found limitations due to a non-severe condition and then failed to incorporate those into the RFC. Instead, this is a case where the ALJ did not find any limitations at all, and as such it was perfectly sensible to leave [those] conditions out of the RFC entirely." *Johnson v. Colvin,* No. 14-C-190, 2014 WL 7336460, at *4 (E.D. Wis. Dec. 22, 2014). *See also Fody v. Colvin,* 169 F. Supp. 3d 804, 809 (N.D. Ill. 2015), aff'd, 641 F. App'x 568 (7th Cir. 2016) ("plaintiff does not explain how the evidence of her mild mental impairments, when viewed in conjunction with her severe physical impairments, necessitated any restrictions greater than those reflected in the ALJ's RFC determination.")

evidence provided by occupational therapist Lisa Parish. Plaintiff appeared for a functional capacity exam that was administered over a two-hour period. (R. 1488.) Parish concluded that the Plaintiff demonstrated "limited tolerance to the overall FCE due to significant pain reports and behaviors, reduced tolerance to all work tasks attempted. She may not be capable of competitive employment at this time." (R. 1490.) The ALJ discussed this report briefly. He implicitly rejected the report's conclusion on the grounds that it was "rather abbreviated and does not contain much in the way of discussion other than simply offering numbers regarding certain activities." (R. 28.) In addition, he found the report was "essentially limited secondary to pain complaints." (*Id.*) These are adequate reasons to reject the opinion, which is from a source considered to be a "non-acceptable" source. In some cases, the opinion of a non-acceptable source may be highly relevant and even trump the opinion of an acceptable treating source, for example, if a therapist has a lengthy relationship with a claimant and the treating source sees her only once. "[I]t may be appropriate to give more weight to the opinion of a medical source who is not an 'acceptable medical source' if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion." SSR 06–3p. Here, however, the occupational therapist merely conducted a short functional exam with the Plaintiff. Given that the Plaintiff's own physician did not believe she was disabled, it was hardly surprising that the ALJ was not persuaded by the therapist's opinion. In addition, an ALJ is not required to accept reports that are based on the Plaintiff's own subjective complaints, and here the therapist's conclusion was based solely on the "significant pain reports and behaviors" that the Plaintiff apparently exhibited during the exam. *Filus v. Astrue,* 694 F.3d 863, 868 (7th Cir. 2012) (explaining that ALJ may discount medical opinions that are based solely on claimant's subjective complaints: "Kachmann's conclusion that Filus

12

could not sit and stand for longer than 30 minutes appears to be based on Filus's report that sitting beyond 15 minutes was painful.")

The Plaintiff also argues, in a single paragraph, that the ALJ failed to articulate what weight, if any, he gave to the opinion of Dr. John Bax, the physician who treated the Plaintiff for carpel tunnel in 1990 and 1991. It is unclear why the Plaintiff believes this opinion should have been addressed in any detail. At the time of her visit with Dr. Bax, the Plaintiff was a seamstress and reported parasthesias in her hands, with the right hand being worse. (R. 1370.) The April 1991 opinion was a discussion of restrictions imposed prior to the Plaintiff's carpal tunnel surgery, and the Plaintiff had been working ever since. Dr. Bax concluded that the Plaintiff should eliminate repetitive motions, defined as "more than 2- to 3000 similar tasks in an eight-hour shift, vibratory tools, frequent extremes of wrist position, and constant high force gripping." (R. 1371.) The ALJ noted the carpal tunnel issue and the fact that there was "little reference to any ongoing problems" in her wrist and that the Plaintiff had a negative EMG study more recently. (R. 31-32.) (It is true, as Plaintiff notes, that a negative EMG does not necessarily rule out carpel tunnel syndrome.) Even if the restrictions imposed by Dr. Bax remained "live" after more than twenty years, however, it is unclear what relevance they would have given that the ALJ concluded the Plaintiff could perform almost the full range of light work, and specifically that she could perform her past work as a day care center worker; the vast majority of light work and all day care work (which she had been performing without notable wrist trouble) does not involve the use of vibratory tools or repetitive wrist motions. *Lockett v. Colvin,* No. 4:12-CV-04062-SLD, 2013 WL 3854480, at *4 (C.D. Ill. July 25, 2013) ("Remanding the case simply because the ALJ failed to provide an exertional limitation is a fruitless endeavor if an exertional limitation would not change the outcome of any reasonable

13

ALJ's decision.")

The Plaintiff further argues the ALJ failed to articulate what weight he gave to state agency reviewing physicians Janis Byrd, M.D. and Mina Khorshidi, M.D. But, as the government notes, the ALJ cited their opinions in establishing his RFC. (R. 32, citing Exhibit 4F and 10F.) Moreover, the opinions of the state agency reviewers concluded that the plaintiff could perform medium level or light work so long as she avoided exposure to fumes and dust, etc. (R. 684, 742.) It is unclear, therefore, how the Plaintiff would expect to fare any better if the ALJ provided a more searching analysis of the opinions of physicians who believed she could perform at least light work. The ALJ adopted the more conservative of the two opinions (Dr. Byrd's), restricting her to light work, and added the limitation on pulmonary irritants that Dr. Khorshidi had imposed.

Notably, the reviewers' opinions are in line with those of her own physician, Dr. Carlson. On December 18, 2013 she had an office visit at which her "chief complaint" was listed as "discuss disability status." (R. 1606.) Dr. Carlson noted her history of migraines and chronic pain, which was "very consistent with fibromyalgia." (*Id.*) However, he refused to support her claim for disability benefits. "Apparently her neurologist and physiatry as at neuroscience clinic refused to fill her disability paperwork. Her psychiatrist at Aurora behavioral health also refuses to fill it out. *I discussed with her I do not believe that she is disabled.* I did review through the multiple pages of paperwork and I do believe she is fully capable of doing this type of work." (*Id.*)(italics added).

In sum, the ALJ correctly downplayed any mental limitations the Plaintiff might experience. And, noting that her own physician did not think she was physically disabled, he found her capable of her past work and light work more broadly. These conclusions were not erroneous.

**C. Credibility**

14

The Plaintiff also argues that the ALJ erred in determining her credibility. As noted above, the ALJ concluded as follows:

> This case essentially comes down to the issues of pain and credibility and simply stated claimant is not all that credible. When factoring in both her physical complaints and her mental complaints and contrasting them with the actual medical records, it becomes quite clear that a certain amount of exaggeration exists not only in terms of the pain complaints, but also regarding claimant's claims of limitations in her activities. While her constant complaining at work may have worn thin on coworkers and prompted concerns by the parents of the children she was involved with, the question is does she have the physical and mental capacity to engage in competitive employment. Claimant had demonstrated such a capacity in the past and looking at the medical evidence in the file, the undersigned sees nothing since 2010 that would change that opinion.

(R. 30-31.)

The ALJ also concluded that the Plaintiff's headaches do not "objectively impact her functioning to the extent that she claims." (R. 31.) The ALJ further noted an event he found unusual. According to Dr. Miranda's notes, the Plaintiff wrote a letter to Dr. Miranda, her then-new psychiatrist, asking for a disability letter and trying to get Dr. Miranda to alter her initial evaluation notes, which had been quite benign. (R. 1595.) For example, those notes had observed that Plaintiff's mood was "stable, okay" and that the Plaintiff denied feeling depressed. (R. 1650.) The notes also reflected that Plaintiff had a history of depression but was "doing well and stable." (R. 1653.) From the Plaintiff's efforts to obtain a disability letter and get Dr. Miranda to make her own treatment notes more supportive of a disability claim, the ALJ concluded that the Plaintiff was less than credible. In addition, the ALJ also found it significant that the Plaintiff's own physician refused to offer a letter of support. Finally, the ALJ found that the claimant's daily activities, including reading, sewing, attending church functions, and a trip to Jamaica, were inconsistent with her testimony that she needed to lie in bed for substantial periods of the day, several days per week.

15

It is of course true that the Plaintiff's daily activities of sewing or reading do not conclusively prove that she was capable of holding down a full-time job. Yet the ALJ's conclusions about credibility cannot be taken in a vacuum or nitpicked one by one. In this case there is one glaring fact, which is that none of the Plaintiff's own physicians supported her claim of disability. While it is true that some of the physicians who were asked apparently had a blanket policy of not issuing disability letters to any patients, the 2013 indication from Dr. Carlson was an explicit rejection of Plaintiff's disability: "*I discussed with her I do not believe that she is disabled.*" (R. 1606.) In addition to that the ALJ cited the unusual fact that the Plaintiff apparently tried to get Dr. Miranda to amend her treatment notes, indicating an interest in creating a record of disability that Dr. Miranda apparently did not share. From these facts it could be inferred that the Plaintiff was not credible in describing her limitations. These reasons, in and of themselves, support the ALJ's credibility finding. *Pepper v. Colvin,* 712 F.3d 351, 367 (7th Cir. 2013) ("An ALJ's credibility determination may be overturned only if it is 'patently wrong.'")

**D. Residual Functional Capacity (RFC)**

The Plaintiff also argues that the ALJ erred in reaching his RFC conclusion. Many of the arguments on this score have been addressed already. For example, the Plaintiff argues that the ALJ should not have relied on Dr. Hauer's opinion. I have concluded above, however, that Dr. Hauer's opinion was a reasonable one, particularly given the most recent treatments notes indicating the Plaintiff's depression being in remission.

The Plaintiff also argues that the ALJ got it wrong in translating the state agency reviewers' opinions into the RFC. She argues that the ALJ cited Dr. Khorshidi's opinion as limiting the Plaintiff to light work, when in reality the opinion states that "there is no indication in the medical records

16

that claimant has a medical condition that limits her to performing less than medium level work." (R. 684.) It is unclear what the Plaintiff means to demonstrate or accomplish by this line of argument. The reviewing physician concluded that the Plaintiff could perform medium level work, and the ALJ took a more conservative approach. In other words, it was a ruling by the ALJ in her own favor, and so it is unclear why that would constitute grounds for reversal. She also argues that Dr. Byrd, the other reviewing physician, had imposed a limitation on gross manipulation (handling things), but the ALJ failed to include that limitation in his RFC. As noted above, however, even if the ALJ should have considered the Plaintiff's carpal tunnel would have imposed a limitation on gross manipulation, a vast swath of available light work, as well as past work as a day care worker, does not require gross manipulation.

**E. Past Work**

Finally, the Plaintiff argues that the ALJ erred in concluding the Plaintiff could have performed her past work. Under SSR 82-62, an ALJ must set forth a finding of fact as to the physical and mental demands of the past job, and he must also make a finding that the individual's RFC would permit a return to that job. Here, Plaintiff argues, the vocational expert testimony did not involve any analysis of the actual job duties the Plaintiff had at her past jobs in childcare.

The government responds by noting that an ALJ is not bound to consider only the claimant's *specific* past jobs—he may also consider the nature of those jobs as they are generally performed in the economy. SSR 82-61. Thus, although it is true that there was no searching inquiry about the nature of the jobs the Plaintiff had actually held, the VE was asked about, and described, the jobs of child care attendant and child day care center worker, which he said are both available in either medium or light-work exertional levels. (R. 97.) In relying on the Dictionary of Occupational Titles,

17

the VE and ALJ were describing work that generally existed, not the Plaintiff's own specific past jobs in the child care field. "Past work can mean two things: (1) the actual functional demands of a particular job that the claimant performed or (2) the functional demands and job duties of such an occupation as it is generally found in the national economy." *Gotz v. Barnhart,* 207 F. Supp.2d 886, 896 (E.D. Wis. 2002) (quoting *Veal v. Bowen,* 833 F.2d 693, 697 (7th Cir. 1987)). The ALJ asked the VE whether someone with the capacity to perform light work would be able to work as a child day care center worker provided that the individual would need to avoid exposure to dust, fumes, etc., and had the ability to wear sunglasses to shield her eyes from light. The VE responded in the affirmative. It is unclear what more the Plaintiff believes is required. The field of child care work is not some sort of mysterious or highly obscure industry that requires a detailed inquiry into minute-by-minute specifics about the course of a worker's typical day. I am therefore satisfied that the testimony elicited by the ALJ suffices to demonstrate that the Plaintiff can perform her past work as it is generally performed in the economy.

## III. Conclusion

This is a case in which the Plaintiff's medical doctor stated that the claimant was not disabled. Her psychiatrist also concluded that the Plaintiff's depression was in remission. Based on this and other evidence, the ALJ was able to conclude that the Plaintiff was not disabled. The decision of the Commissioner is therefore affirmed. The clerk will enter judgment accordingly.

**SO ORDERED** this __7th__ day of March, 2017.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court